IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

JUAN SILLAS-ROCHA,
a/k/a JUANILO SILLAS,
a/k/a MAURICIO, a/k/a RUEDAS,

Defendant.

Case No. 3:08-cr-88

**PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the

United States of America, by its attorneys, Mac Schneider, United States Attorney for the

District of North Dakota, and Christopher C. Myers, Assistant United States Attorney;

Defendant, JUAN SILLAS-ROCHA; and Defendant's counsel, Matthew Lombard, agree

to the following:

1. Defendant acknowledges the Superseding Indictment charges violations of

Title 21, United States Code, Sections 846, 848(a), 848(b)(1), 848(b)(2)(A), 848(c),

848(e)(1)(A), 848(s), and Title 18 United States Code Section 2.

2. Defendant has read the charges and Defendant's attorney has fully

explained the charges to Defendant.

3. Defendant fully understands the nature and elements of the charged crimes.

4. Defendant will voluntarily plead guilty to Counts One, Two, and Three of

the Superseding Indictment.

5.     The parties agree this Plea Agreement shall be filed as part of the Court record and be governed by Federal Rule of Criminal Procedure 11(c). The parties specifically agree that Rule 11(c)(1)(C) does not apply. If the United States makes the non-binding recommendations specified in this Plea Agreement, then Defendant acknowledges that this agreement will have been fulfilled. Except as provided in Rule 11(c)(5), the Court's refusal to accept any or all terms of the Plea Agreement does not give Defendant a right to withdraw Defendant's guilty plea.

6.     Defendant will plead guilty because Defendant is in fact guilty of the charges. In pleading guilty to Counts One, Two, and Three, Defendant acknowledges that as to Count One:

From on or about January 1, 2002, and continuously until the date of this Superseding Indictment, in the District of North Dakota, and elsewhere,

> JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS,
> a/k/a MAURICIO, a/k/a RUEDAS,

did knowingly and intentionally combine, conspire, confederate, and agree together with Jorge Manuel Aranda, a/k/a Sneaky, et al., previously indicted and convicted in the District of North Dakota, Southeastern Division, Case No. 3:05-cr-101, and others, both known and unknown to the grand jury, to possess with intent to distribute and distribute in excess of 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; in excess of 5,000 grams of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and in excess of 1,000 kilograms of marijuana, a Schedule I

2

controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Overt Acts

In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the conspirators committed the following overt acts:

1. It was a part of said conspiracy that the defendant and others would and did possess with intent to distribute and did distribute in excess of 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, within the states of North Dakota, Minnesota, Nebraska, Washington, California, and elsewhere;

2. It was further a part of said conspiracy that the defendant and others would and did possess with intent to distribute and did distribute in excess of 5,000 grams of cocaine, a Schedule II controlled substance, and in excess of 1,000 kilograms of marijuana, a Schedule I controlled substance, within the states of North Dakota, Minnesota, Nebraska, Washington, California, and elsewhere;

3. It was further a part of said conspiracy that the defendant and others would and did attempt to conceal their activities;

4. It was further a part of said conspiracy that the defendant and others would and did use telecommunication facilities;

5. It was further a part of said conspiracy that the defendant and others would and did use United States currency in their drug transactions;

3

6. During the course of said conspiracy, members of the conspiracy, both known and unknown to the grand jury, transferred and arranged the transfer of methamphetamine, cocaine, and marijuana from Mexico, Washington, California, and elsewhere to the Red River Valley area in North Dakota and to other parts of the United States for distribution;

7. It was further a part of said conspiracy that the defendant and others would and did use violence and the threat of violence to promote their drug trafficking activities, including, but not limited to, murder, kidnapping, and assault;

8. During the course of and to further said conspiracy, members of the conspiracy, through the use of money wires, transferred, received, and arranged to have United States currency transferred and received to and from various locations;

9. It was further a part of said conspiracy that motor vehicles were exchanged for controlled substances;

10. It was further a part of said conspiracy that firearms were exchanged for controlled substances;

11. During the course of this conspiracy, in excess of 15 kilograms (15,000 grams) of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, was distributed by members of the conspiracy;

In violation of Title 21, United States Code, Section 846; Pinkerton v. United States, 328 U.S. 640 (1946).

As to Count Two, defendant acknowledges that:

From on or about January 1, 2002, and continuously until the date of this Superseding Indictment, in the District of North Dakota, and elsewhere,

JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS,
a/k/a MAURICIO, a/k/a RUEDAS,

did knowingly and intentionally engage in a Continuing Criminal Enterprise, in that he did violate Title 21, United States Code, Sections 841(a)(1) and 846, including, but not limited to, the violations alleged in Count One of this Superseding Indictment. Count One is incorporated herein by reference.

During the course of the enterprise, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, emerged as a high-ranking member of the Arellano-Felix Drug Trafficking Organization, which continues, as of the date of this Superseding Indictment, to be led by Fernando Sanchez-Arellano, a/ka Ingeniero.

During the court of the enterprise, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, was involved in the supervision of crews that were involved in drug trafficking. JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, was involved in the supervision of crews that participated in murder, attempted murder, kidnapping, human trafficking, public corruption of government officials, money laundering, and other illegal conduct designed to further the goal of enriching the members of the enterprise.

The above-described violations were, and are, part of a continuing series of felony drug trafficking violations which include, but are not limited to:

5

a.  JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, on multiple and separate occasions, personally distributed or aided and abetted the distribution of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, to indicated and unindicted co-conspirators in North Dakota, and elsewhere in the United States, during the time frame of the enterprise.

b.  JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, on multiple and separate occasions, personally distributed or aided and abetted the distribution of a mixture and substance containing a detectable amount methamphetamine, a Schedule II controlled substance, to indicted and unindicted co-conspirators in North Dakota, and elsewhere in the United States, during the time frame of the enterprise.

c.  JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, on multiple and separate occasions, personally distributed or aided and abetted the distribution of a mixture and substance containing marijuana, a Schedule I controlled substance, to indicted and unindicted co-conspirators in North Dakota, and elsewhere in the United States, during the time frame of the enterprise.

This continuing series of violations was undertaken by JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, in concert with at least five other persons with respect to whom defendant JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, occupied a position of organizer, supervisor, and manager, including, but not limited to, the following individuals:  (1) Loretto Alvarado; (2) Guadalupe Higuerra-Gutierrez, a/k/a Lupio;

6

(3) Quelino Elenes, a/k/a Lino; (4) Octavio Leal, a/k/a Chapito; (5) Teodulo Andrade-Espinosa; (6) Guadalupe Becerra Herrera; (7) Jaime Gomez-Colorado; (8) Jose Angel Flores Ayala, a/k/a El Pepe; (9) Jesus Javier Avitia Gonzalez, a/k/a El Avitia; (10) Juan Carlos Aldama Beltran, a/k/a El Juanito; (11) Mauricio Herrera Guzman, a/k/a El Gordo; (12) Carlos Humberto Gomez Flores; (13) Ismael Castro; (14) Jose Benjamin Gonzalez Martinez, a/k/a El Muerto; (15) Emanuel Hernandez Pinedo, a/k/a El Gordon; (16) Victor Manuel Alfani Avalos, a/k/a El Alfani; (17) Roberto Diaz Bastida, a/k/a El Yenco; (18) Jorge Sillas-Rocha; (19) Francisco Manzo Moran, a/k/a El Billy, a/k/a Manzo; (20) Chorey, a/k/a Shorty; (21) Rata; (22) Jabo, a/k/a Jablito; (23) Compa Beto; (24) Marquitos; (25) Danny Cepallo; (26) Victor Gonzalez; (27) I.M.; (28) Julio Cesar Cruz-Melendrez, a/k/a Pocho; (29) Guadalupe Castro-Navarette, a/k/a El Doc; and (30) Luis Leonardo Rocha-Ramirez, a/k/a El Prino, a/k/a El Primo, a/k/a Pantera.

From this continuing series of violations, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, obtained substantial income. As part of this Continuing Criminal Enterprise, in excess of 15 kilograms (15,000 grams) of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, was distributed by the enterprise;

In violation of Title 21, United States Code, Sections 848(a), 848(b)(1), 848(b)(2)(A), 848(c), and 848(s).

As to Count Three, defendant acknowledges that:

On or about February 1, 2011, through February 17, 2011, in the Southern District of California, and elsewhere,

JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS,
a/k/a MAURICIO, a/k/a RUEDAS,

while engaging in and working in furtherance of a Continuing Criminal Enterprise and

while engaging in a controlled substance offense punishable under 21 U.S.C.

§ 841(b)(1)(A), to wit:  Continuing Criminal Enterprise as alleged in Count Two of this

Superseding Indictment and conspiracy to possess with intent to distribute and distribute

controlled substances, as alleged in Count One of this Superseding Indictment, did

knowingly and intentionally combine, conspire, confederate, and agree together with

Jorge Sillas, Danny Cepallo, and Victor Gonzalez to cause the intentional killing of L.L.

and I.Z.

Overt Acts

In furtherance of this conspiracy and to effect and accomplish the objects of it, one

or more of the conspirators committed the following overt acts:

1. On or about February 1, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLO

SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted a person by phone who was an

informant for the government (hereinafter CI) and requested that CI find a hit squad to

murder two California residents;

2. On or about February 1, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLO

SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted CI by phone and further

discussed details about the plot to kill the two California residents;

3. On or about February 1, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLO

SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted CI by phone and informed him

8

that SILLAS-ROCHA had offered to pay members of the Logan Heights criminal street gang $25,000 to commit the murders and had paid them a $4,000 deposit, however, the Logan Heights gang members could not find the victims, so JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, wanted the CI to find new assassins;

    4. On or about February 1, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted CI by phone and told CI to drive north on Interstate 15 to Victorville, California, and exit at Bear Valley Road, where SILLAS-ROCHA's brother would give CI "paperwork" for the intended male victim;

    5. On or about and between February 1, 2011, and February 2, 2011, Jorge Ernesto Sillas-Rocha, Victor Magana Gonzalez, and Danny Cepallo drive in a 2004 Dodge Stratus to the planned meeting location;

    6. On or about and between February 1, 2011, and February 2, 2011, Jorge Ernesto Sillas-Rocha, Victor Magana Gonzalez, and Danny Cepallo surveilled the area on Bear Valley Road prior to meeting the CI;

    7. On or about and between February 1, 2011, and February 2, 2011, Jorge Ernesto Sillas-Rocha gave an envelope to CI containing a photograph of the intended male murder victim;

    8. On or about and between February 1, 2011, and February 2, 2011, Jorge Ernesto Sillas-Rocha gave an envelope to CI containing directions to the intended male victim's residence;

9. On or about and between February 1, 2011, and February 2, 2011, Victor Magana Gonzalez and Danny Cepallo acted as lookouts while Jorge Ernesto Sillas-Rocha met with CI;

10. On or about and between February 1, 2011, and February 2, 2011, after the meeting on Bear Valley Road, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted CI by phone and said that he would pay $50,000 if the murders could be done soon;

11. On or about February 3, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted CI by phone and told him the first name of the intended female murder victim and that JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, was going to call his brother, Jorge Ernesto Sillas-Rocha, to deliver a photograph of the woman to CI;

12. On or about February 3, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted CI and authorized CI to set up a meeting with Jorge Ernesto Sillas-Rocha to receive further information to accomplish the murders;

13. On or about and between February 3, 2011, and February 4, 2011, Jorge Ernesto Sillas-Rocha contacted CI by phone and made arrangements to deliver a photograph of the intended female victim to CI in San Diego, California;

14. On or about February 5, 2011, Jorge Ernesto Sillas-Rocha directed CI by phone to the meeting location in the city of Oceanside, San Diego County, where CI would be given the photograph of the intended female victim;

10

15. On or about February 5, 2011, Victor Gonzalez met CI in the city of Oceanside, San Diego County, and handed CI a photograph of a female and stated that this was the photograph of the female that JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, wanted murdered in California;

16. On or about February 5, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLOA SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, contacted CI by phone and ordered him to make the murders happen the following day and to kill everyone except the disabled girl;

17. On or about and between February 6, 2011, and February 8, 2011, JUAN SILLAS-ROCHA, a/k/a JUANILLO SILLAS, a/k/a MAURICIO, a/k/a RUEDAS, ordered CI by phone to kill the entire family inside their home;

18. On or about and between February 6, 2011, and February 8,2011, CI spoke to Victor Gonzalez by phone and informed him that the intended victims had not been seen at the residence all week. Victor Gonzales acknowledged this and handed the phone to Jorge Ernesto Sillas-Rocha, who continued the conversation about the plot to kill the victims;

19. On or about and between February 6, 201, and February 8, 2011, Jorge Ernesto Sillas-Rocha and CI discussed finding the intended victims and Jorge Ernesto Sillas-Rocha stated that he would send someone to the residence to located the intended victims;

In violation of Title 21, United States Code, Sections 846 and 848(e)(1)(A), and Title 18, United States Code, Section 2.

7.    Defendant understands the following maximum penalties apply:

Count One

| | |
|---|---|
| Imprisonment: | Life; 10-year minimum-mandatory imprisonment |
| Fine: | $4 million |
| Supervised Release: | 5 years |
| Special Assessment: | $100 |

Count Two

| | |
|---|---|
| Imprisonment: | Life; minimum-mandatory life imprisonment |
| Fine: | $2 million |
| Supervised Release: | 5 years |
| Special Assessment: | $100 |

Count Three

| | |
|---|---|
| Imprisonment: | Life; 20-year minimum mandatory imprisonment |
| Fine: | $2 million |
| Supervised Release: | 5 years |
| Special Assessment: | $100 |

Defendant agrees to pay the Clerk of United States District Court the special assessment on or before the day of sentencing.

8.    Defendant understands that by pleading guilty Defendant surrenders rights, including:

(a)    The right to a speedy public jury trial and related rights as follow:

(i)    A jury would be composed of twelve (12) lay persons selected at random. Defendant and Defendant's attorney would help choose the jurors by removing prospective jurors "for cause," where actual bias or other disqualification is shown; or by removing jurors without cause by exercising so-called peremptory challenges. The jury would have to agree

12

unanimously before it could return a verdict. The jury would be instructed that Defendant is presumed innocent and that it could not return a guilty verdict unless it found Defendant guilty beyond a reasonable doubt.

(ii)     If a trial were held without a jury, then the Judge would find the facts and determine whether Defendant was guilty beyond a reasonable doubt.

(iii)     At a trial, whether by a jury or Judge, the United States is required to present witness testimony and other evidence against Defendant. Defendant's attorney can confront and examine them. In turn, the defense can present witness testimony and other evidence. If witnesses for Defendant refuse to appear voluntarily, Defendant can require their attendance through the subpoena power of the Court.

(iv)     At a trial, Defendant has a privilege against self-incrimination; thus, Defendant can decline to testify. No inference of guilt can be drawn from Defendant's refusal to testify. Defendant can choose to testify, but cannot be required to testify.

(b)     Defendant has a right to remain silent. However, under terms of the Plea Agreement, the Judge will likely ask Defendant questions about Defendant's criminal conduct to ensure that there is a factual basis for Defendant's plea.

9.     Defendant understands that by pleading guilty Defendant is giving up all of the rights set forth in the prior paragraph, and there will be no trial. Defendant's attorney has explained those rights, and consequences of Defendant's waiver.

10.     The Court shall impose a sentence sufficient to comply with purposes set forth in the Sentencing Reform Act. In doing so, the Court shall consider factors set forth in 18 U.S.C. § 3553(a) and must consult and consider the United States' Sentencing Commission, Guidelines Manual, (Nov. 2021) (USSG). Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation and Pretrial Services Office of the nature, scope, and extent of Defendant's conduct, including all matters in aggravation and mitigation relevant to the issue of sentencing. The United States expressly reserves the right to appeal from an unreasonable sentence.

11.     This Plea Agreement is binding only upon the United States Attorney for the District of North Dakota. It does not bind any United States Attorney outside the District of North Dakota, nor does it bind any state or local prosecutor. They remain free to prosecute Defendant for any offenses under their jurisdiction. This Plea Agreement also does not bar or compromise any civil or administrative claim.

12.     Defendant understands the United States Attorney reserves the right to notify any local, state, or federal agency by whom Defendant is licensed, or with whom Defendant does business, of Defendant's conviction.

13.     The parties agree that the base offense level under the Sentencing Guidelines for Defendant's conduct is life imprisonment, including the 3-level adjustment for acceptance of responsibility, if applicable, outlined in paragraphs 14 and 15 below.

14

14.     At sentencing, United States agrees to recommend a 2-level downward adjustment for acceptance of responsibility, provided Defendant has demonstrated a genuine acceptance of responsibility. (USSG § 3E1.1(a)). The United States further agrees to move for an additional 1-level downward adjustment for timely notifying the United States of Defendant's intention to enter a guilty plea, thus permitting the Court and the United States to allocate their resources efficiently. (USSG § 3E1.1(b)).

15.     The parties stipulate and agree that, as of the date of this agreement, Defendant appears to qualify for a 2-level downward adjustment for acceptance of responsibility. However, the government may, in its discretion, contest the adjustment under USSG § 3E1.1(a) should Defendant subsequently fail to continue to accept responsibility by failing to abide by the conditions of release, if applicable; by providing false information to the Court, the probation office, or the United States; by unlawfully using controlled substances; by attempting to obstruct justice; by breaching this Plea Agreement; or by acting in a way that is inconsistent with, or failing to act in any way that is consistent with the granting of the adjustment under USSG § 3E1.1(a).

16.     Neither the Court nor the Probation Office is a party to the Plea Agreement. Neither the Court nor the Probation Office is bound by the Plea Agreement as to determining the Sentencing Guideline range. The Court may depart from the applicable guidelines range if the Court, on the record, states factors not contemplated by the Sentencing Guidelines' Commission to justify the departure. Both parties reserve the right to object to any departure. See USSG § 1B1.1, comment. (n.1) (defines "departure"). There may be other adjustments the parties have not agreed upon.

15

17.     At sentencing, the United States will:

      (a)     Recommend a sentence of life imprisonment; and

      (b)     Recommend that Defendant be ordered to pay restitution to be determined at the time of sentencing.

18.     Defendant acknowledges and understands that if Defendant violates any term of this Plea Agreement, engages in any further criminal activity, or fails to appear for sentencing, the United States will be released from its commitments. In that event, this Plea Agreement shall become null and void at the discretion of the United States, and Defendant will face the following consequences: (1) all testimony and other information Defendant has provided at any time to attorneys, employees, or law enforcement officers of the government, to the Court, or to the Federal Grand Jury, may be used against Defendant in any prosecution or proceeding; and (2) the United States will be entitled to reinstate previously dismissed charges and/or pursue additional charges against Defendant and to use any information obtained directly or indirectly from Defendant in those additional prosecutions. Nothing in this agreement prevents the United States from prosecuting Defendant for perjury, false statement(s), or false declaration(s), if Defendant commits such acts in connection with this agreement or otherwise.

19.     Defendant acknowledges the provisions of Title 18, United States Code, Sections 2259 and 3663A, which require the Court to order restitution. Defendant agrees to pay restitution as may be ordered by the Court. Defendant acknowledges and agrees that the Court will order Defendant to make restitution for all loss caused by Defendant's conduct, regardless of whether counts of the Superseding Indictment will be dismissed as

part of this Plea Agreement. Defendant further agrees to grant the United States a wage assignment, liquidate assets, or complete any other tasks the Court finds reasonable and appropriate for the prompt payment of any restitution or fine ordered by the Court.

20.    The United States will file a Supplement in this case, as is routinely done in every case, even though there may or may not be any additional terms. Defendant and Defendant's attorney acknowledge that no threats, promises, or representations exist beyond the terms of this Plea Agreement.

21.    **Defendant's Waiver of Appeal**. Defendant acknowledges having been advised by counsel of Defendant's rights to appeal the conviction or sentence in this case, including the appeal right conferred by 18 U.S.C. § 3742, and to challenge the conviction or sentence collaterally through post-conviction proceedings, including proceedings under 28 U.S.C. § 2255. Defendant understands these rights, and in exchange for the concessions made by the United States in this plea agreement, Defendant hereby knowingly and voluntarily waives these rights, except as specifically reserved herein. Defendant's waiver of these rights includes, but is not limited to, a waiver of all rights to appeal or to collaterally attack: Defendant's conviction or sentence; all non-jurisdictional issues; any assessment, restitution or forfeiture order; the constitutionality of the applicable guidelines; and the constitutionality of the statute(s) to which Defendant is pleading guilty or under which Defendant is sentenced, or to argue that the admitted conduct does not fall within the scope of the statute(s). Defendant reserves the right to appeal a sentence of imprisonment imposed above the upper end of the applicable guidelines range and the right to appeal or to collaterally attack the conviction or sentence

17

based on a claim of ineffective assistance of counsel that challenges the validity of the guilty plea or this waiver.

22.    By signing this Plea Agreement, Defendant further specifically waives Defendant's right to seek to withdraw Defendant's plea of guilty, pursuant to Federal Rules of Criminal Procedure 11(d), once the plea has been entered in accordance with this agreement. The appellate court will enforce such waivers. Defendant agrees that any attempt to withdraw Defendant's plea will be denied and any appeal of such denial should be dismissed.

23.    The Assistant United States Attorney and attorney for Defendant agree to abide by the provisions of Rule 32(f) of the Federal Rules of Criminal Procedure. The attorneys acknowledge their obligation to use good-faith efforts to resolve any disputes regarding the Presentence Investigation Report (PSIR) through a presentence conference or other informal procedures.

24.    Defendant understands that by pleading guilty he will be convicted, and that any individual convicted who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant's attorney has explained this consequence of his guilty plea.

25.    Defendant acknowledges reading and understanding all provisions of the Plea Agreement. Defendant and Defendant's attorney have discussed the case and reviewed the Plea Agreement. They have discussed Defendant's constitutional and other rights, including, but not limited to, Defendant's plea-statement rights under Rule 410 of

the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure.

AGREED:

MAC SCHNEIDER
United States Attorney

Dated: _____May 18, 2023_____

By: CHRISTOPHER C. MYERS
Assistant United States Attorney

Dated: _17 / 5 / 23_

JUAN SILLAS-ROCHA
a/k/a JUANILLO SILLAS,
a/k/a MAURICIO, a/k/a RUEDAS
Defendant

Dated: _5/17/23_

MATTHEW LOMBARD
Attorney for Defendant

19